James T. CLARK, Petitioner,

v.

Dr. R. O. SETTLE, Warden, Medical Center for Federal Prisoners, Springfield, Missouri.

No. 13894–1.

United States District Court
W. D. Missouri, W. D.

June 11, 1962.

James T. Clark, pro se, petitioner.

F. Russell Millin, U. S. Dist. Atty., for respondent.

John W. Oliver, District Judge.

This case involves another important question of administration under Section 4243, Title 18 U.S.C.[1] Petitioner's letter to the Court states, and the files and records of the Department of Justice confirm, that he was given a three year sentence on June 29, 1959 by the United States District Court for the District of Arizona, on plea of guilty, for violation of the Dyer Act (18 U.S.C. § 2312); that he was determined to be of unsound mind by the Board of Examiners at Leavenworth Penitentiary and on August 17, 1960 ordered removed to The Medical Center at Springfield, Missouri, pursuant to Section 4241, Title 18 U.S. C.; and that his maximum sentence will expire June 28, 1962. While petitioner's letter states that he does not "know how to file a writ of habeas corpus", it is clear that the relief requested is a "hearing to establish my sanity".

What we said in Craft determines that this Court does not have jurisdiction to review the administrative determination relating to petitioner's mental

1. Craft v. Settle, (W.D., Mo.) 205 F.Supp. 775, decided June 1, 1962, related to the question of who the "proper authorities" of a particular State are to whom an insane federal prisoner, on the expiration of his maximum sentence, may be delivered pursuant to Section 4243, Title 18 U.S.C. In that case, West Virginia was willing to accept the prisoner. In this case, Massachusetts, up to this point, has refused.

condition made pursuant to Section 4241. This case, however, presents a factual difference from Craft that raises another facet of the problem of state and federal comity and cooperation in regard to the handling of mental defectives.[2] As noted in Craft, West Virginia was willing to accept the prisoner. In this case, Massachusetts, thus far, has refused to so do. Because Massachusetts' refusal may not be final, the factual circumstances of this case will be stated. We shall then outline several principles of law that may have not been yet considered by that State. We, of course, do not presume to tell Massachusetts what it should do. We do presume, however, that Massachusetts' demonstated concern with the general problem is equal to that of her sister States and that of the United States and that she has every intention and desire to act in a humane and reasonable manner.

Petitioner's letter and the files and records of the Department of Justice show that petitioner was born on April 30, 1930 in Jefferson City, Missouri; that his father, a native of Missouri, died April 21, 1931, in a Veterans' Hospital at Excelsior Springs, Missouri before petitioner was a year old; that his mother immediately after her husband's death returned to her Massachusetts native home near Boston, taking petitioner with her; that petitioner was there raised in Massachusetts; that he was educated in the public and parochial schools of Massachusetts; and that since early adulthood, petitioner began to roam around the country.

The Classification Study of the Bureau of Prisons notes petitioner's "place of residence" as Boston, Massachusetts. Other Department of Justice records at Leavenworth reflect that "Clark belongs in Boston, Massachusetts", and report his "residence" as Massachusetts. The records at Springfield Medical Center, after his transfer, likewise reflect that it was petitioner's desire and intention "if released, (to) return to live with his mother" in Massachusetts.

Respondent, pursuant to the duty imposed on him by Section 4243,[3] wrote Dr. Harry C. Soloman, Commissioner of the Massachusetts State Department of Health, notifying him that petitioner would be "released from our custody at the expiration of his maximum sentence on June 28, 1962". That letter further stated that "our records indicate that Clark has residence in Massachusetts". It is clear that respondent was not authorized by Section 4243 to notify any authorities other than Massachusetts because the authorities of the place from which petitioner was committed could be notified only in the event petitioner's "legal residence * * * cannot be ascertained".

An Assistant to Dr. Soloman wrote back that "patient has no claim as a resident of Massachusetts" and "in view of this fact, we cannot accept him in transfer from you".[4]

---

2. The Interstate Compact of Mental Health, thus far adopted by at least seventeen states, including Massachusetts, is an excellent example of how enlightened States have recognized that "proper and expeditious treatment of the mentally ill and mentally deficient can be facilitated by cooperative action" and that "such care and treatment bears no primary relation to the residence or citizenship of the patient".

3. Section 4243 provides that "The superintendent of the United States hospital for defective delinquents shall notify the proper authorities of the State, Territory, District, or Possession where any insane prisoner has his legal residence, or, if this cannot be ascertained, the proper authorities of the State, Territory, District, or Possession from which he was committed, of the date of expiration of sentence of any prisoner who, in the judgment of such superintendent, is still insane or a menace to the public. Such superintendent shall cause such prisoner to be delivered into the custody of the proper authorities of such State, Territory, District or Possession".

4. The Assistant to the Commissioner did suggest, however, that "If he is later hospitalized in Missouri or another of the states that are parties to the Interstate Compact of Mental Health, we would then consider his transfer under the Compact".

Respondent, expressing the "hope that some formula may be arrived at which will not preclude the patient receiving further care or the community receiving protection against his irresponsible activities", then advised Massachusetts that "Missouri will not accept our patients for commitment and later possible transfer". In his second letter respondent also inquired whether Massachusetts had any reciprocal relationship with the State of Connecticut whereby acceptance of this patient for further care might be simplified were we to transfer him to our Correctional Institution at Danbury, Connecticut".

But, more important, respondent, quite inaccurately from a legal point of view (as we shall presently notice), stated in that letter "I suppose we shall have to concur in your findings that there is no demonstrable, current claim by the patient to Massachusetts settlement".[5] In the same vein, respondent stated further that "Mr. Clark appears to have lost his original settlement claim—which appears to have been pretty clearly in Massachusetts—without establishing any vestige of entitlement in any other state." [6]

It is thus apparent that the two doctors were in more or less agreement as to the answer to the not uncomplicated legal question of petitioner's domicile and residence. The fear expressed by the Assistant to the Commissioner of Massachusetts' Department of Mental Health that "if I should authorize your patient's transfer here, I might be held personally liable for the expenses arising from his care" could only be based upon the assumption that petitioner was not, under the law, a resident of Massachusetts.[7]

As we will presently state, that assumption is clearly erroneous and is one, the validity of which cannot be sustained under the law.

It is also clear that Massachusetts' idea that federal custody may be continued in some other federal institution is equally faulty. Respondent has advised this Court that "psychiatrically we do not believe that this patient fits the circumstances outlined in Section 4247". For that reason, the United States did not seek—and under the facts as determined by the respondent was not authorized—to exercise the power conferred by Section 4247, Title 18 U.S.C.

5. The use of the word "settlement" (and "legal settlement", as used in respondent's original notification letter) by respondent, a member of the medical profession, is as unintelligible to the legal profession as the use of the word "insane" by the legal profession is superficially incomprehensible to the medical profession. Cf. Judge Biggs comment in United States v. Currens, 3 Cir., 290 F.2d 751, 765 (footnote 20) where he stated: "It must be borne in mind that the terms 'sane' and 'insane' are legal words and not words of art employed by doctors of medicine".

6. The word "entitlement" is likewise unknown to the law but not infrequently in use by medical administrators. Dr. Settle's additional statement that "the patient has been an involuntary *resident* of a Federal Institution" further illustrates the use of legal words of art in a manner unknown to the law. One cannot become an "involuntary resident" of any place because the element of intention is inextricably entwined in the whole legal concept and rationale of "domicile" and

"residence" as those words are used in the law. See Footnote #8.

7. The Assistant to the Commissioner was also under the impression that respondent was authorized by law to transfer petitioner to some other federal institution after the expiration of petitioner's maximum sentence. He suggested a transfer to either St. Elizabeth's in Washington, D. C., or one of the United States Public Health Service Hospitals including (but not limited to) the Brighton Marine Hospital in Boston. Perhaps not without a touch of factitiousness, the Assistant added that "aside from the humanitarian or ethical aspects of such action, one would think you might instead consider transporting Mr. Clark to the office of your superiors at the United States Department of Justice in Washington, D. C., since it is their responsibility to provide you with adequate facilities or measures for his care". Of course, the power of the United States under Section 4243 is exhausted when a prisoner's maximum sentence expires and further federal custody would be unlawful.

■ Under Section 4247, this Court (it being the "court for the district in which the prisoner is confined") has power, but only after a notice and a hearing, to confirm the judgment and certification of the Director of the Bureau of Prisons and the Board of Examiners that a "prisoner is insane or mentally incompetent, *and* that if released he will probably endanger the safety of the officers, the property, or other interests of the United States, *and* that suitable arrangements for the custody and care of the prisoner are not otherwise available". If there is proof of each of those three facts, then thereafter, and on the basis of such a finding, this Court would be empowered to commit a particular prisoner to the custody of the Attorney General, or his authorized representative. The term of commitment under the alternative release procedure authorized under Section 4247 of a prisoner who had first been transferred to Springfield Medical Center under Section 4241 and who might thereafter be adjudicated at the later court hearing required by Section 4247 would run only until the prisoner's sanity or mental condition has been so improved that if released, he will no longer be dangerous, or until suitable arrangements shall have been made for his custody and care by the State of his residence, whichever event shall first occur.

Respondent has, as noted above, definitively stated that "psychiatrically we do not believe that this patient fits the circumstances outlined in Section 4247". Section 4243 is therefore the only applicable statute under which federal power can be exercised. And the alternatives of what the United States can do with and for the petitioner under the mandatory directions of Section 4243, absent a change of position by Massachusetts, is both limited and severe.

■ Section 4243 directed the respondent to notify Massachusetts. He did so. Was Massachusetts' refusal to accept the petitioner on the theory that he is not a citizen and legal resident of that State based on tenable ground? We think not.

There can be, and there was no disagreement that petitioner was, after he and his mother moved back to her native home, a son of Massachusetts. Is there anything in this record upon which anyone can maintain that petitioner has ever changed his original Massachusetts domicile and legal residence? And without such evidence, may Massachusetts, in effect, now disown her son? Again, we think not.

In treating with the not uncomplicated problem of determining where it must be said that a man legally lives, the law speaks, and the words are used as words of art, in terms of "domicile", "residence", and "citizenship". The words "entitlement" and "settlement" are not a part of the technical legal vocabulary.[8]

In re Kalpachnikoff, (D.C.E.D., Pa.) 28 F.2d 288, 290 (1928), pointed out that:

> "There are several different words in our language which in common speech convey the like meaning. Among them are 'lives' and 'resides,' and phrases of the like import, such as 'makes his home' and 'has his domicile.' The idea, meant to be conveyed by these and the like words and phrases of common usage, is clear enough, but the meaning of the word 'residence' or 'domicile,' when employed in a statute, is often provocative of dispute."

That case, a naturalization case, pointed out that when the words "resides" or "residence" are used in a statute, they are used "in the language of lawyers"

8. The word "settlement" does appear in Bouvier's Law Dictionary and Blackstone's Commentaries, 1:363. The ancient usage related to the right of a pauper to support or assistance and did involve the element of residence. The word is not in current use in modern statutes. The word "entitlement" has, so far as we have been able to find, never had a legal meaning.

and not in "the light of usages of common speech". At the opposite end of petitioner's social pattern, that court noted that in the usage of common speech "it is not an uncommon thing for a man to have several homes * * * the expression country house and town house, summer home or residence and winter home, are not uncommon". But that court held that from a legal viewpoint—and in both the language and the eyes of the law—"the same person has, however, but one domicile or residence".

■ And, more important for our purposes, is it legally possible for one to lose his legal residence and to be without one altogether? More precisely, can it be said that petitioner gave up his admitted legal residence in Massachusetts when he began to roam the rest of the country? Kalpachnikoff states the universal legal rule that "a legal residence or domicile * * * when once acquired" is retained by a man "until he has acquired a different one". See also DeMarcus v. Overholser, D.C.Cir., 122 F.2d 16, 17, cert. denied 314 U.S. 609, 62 S.Ct. 97, 86 L.Ed. 490, a case involving the transfer of a mental incompetent from federal to state custody. That case correctly pointed out that one can not lose his legal residence and gain a new one "except by abandonment of his former residence *and* the adoption of a new one". As held in Gates v. Commissioner of Internal Revenue, 10 Cir., 199 F.2d 291, 294 (1952) "the domicile of origin * * * continues until another domicile is lawfully acquired". Merely because one leaves home does not and can not mean he has abandoned his legal domicile. Nor does the fact that he moves aimlessly around the country mean that he is seeking to acquire a new domicile. As pointed out in Spurgeon v. Mission State Bank, 8 Cir., 151 F.2d 702, 705–706 (1945), cert. denied 327 U.S. 782, 66 S.Ct. 682, 90 L.Ed. 1009:

"To acquire a domicil of choice, the law requires the physical presence of a person at the place of the domicil claimed, coupled with the intention of making it his present home. When these two facts concur, the change in domicil is instantaneous."

■ Texas v. State of Florida, 306 U.S. 398, 424, 59 S.Ct. 563, 83 L.Ed. 817 (1939) states the applicable legal principle tersely: "Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile."

■ The available factual data makes clear that petitioner became a resident of Massachusetts when his mother returned to that state after his father's death in 1931; that while he has wandered over the country, he has never attempted to abandon his Massachusetts domicile nor has he even attempted to acquire a new one; and that he is in fact and in law still a legal resident of that State. Under those circumstances, respondent is clearly authorized, and is in fact, required by Section 4243, to pursue the action he has indicated he intends to follow. The relief requested in petitioner's letter must therefore be denied for the reasons stated.

This Court lacks power under the law to do anything except determine that the proposed action of the respondent is legal and that he has no alternative except to follow the mandate of Section 4243, Title 18 U.S.C. We must presume, as we held in Craft, that Massachusetts will afford petitioner due process when he is delivered to the proper authorities of that state pursuant to that law. Our familiarity with Massachusetts' pioneering Briggs Law causes us to believe that such a presumption is well established.[9]

This Court also recognizes that it has no power to force the Commonwealth of Massachusetts to review its initial determination to deny further medical care to petitioner. See Howard v. Overholser,

9. See Overholser, "The Briggs Law of Massachusetts: A Review and an Appraisal", Journal of Criminal Law and Criminology, 35:859, 1935.

76 U.S.App.D.C. 166, 130 F.2d 429 (1942) and Williams v. Overholser, 78 U.S.App.D.C. 95, 137 F.2d 545 (1943).

Respondent is advised, however, although he is not directed, for that is a matter within his administrative discretion, that if he should determine that it might be in the public interest to reopen his correspondence with the proper authorities of Massachusetts and that should he desire to forward a copy of this Memorandum and Order to those authorities, he has the permission of the Court to do so.

This Court is convinced that Massachusetts is in agreement with the fundamental principle that "it must be kept in mind that we are one people; and the powers reserved to the States and those conferred on the Nation are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral". Hoke v. United States, 227 U.S. 308, 322, 33 S.Ct. 281, 57 L.Ed. 523 (1913). We also believe that Massachusetts is in agreement with the idea that "mental illness is the area in which informed collaboration between the medical pro-

fession and the legal profession is most necessary".[10] We would further be hopeful that the Massachusetts Department of Mental Health would make inquiry of the Attorney General's office of that Commonwealth as to whether or not the petitioner is in fact and law a resident of Massachusetts and therefore eligible for the medical care that he presumably needs.

The Court reiterates that it does not have any inclination, to say nothing of its lack of power and jurisdiction, to force Massachusetts to do anything. That is not to say that this Court would be either unhappy or disappointed if matters developed in a manner that Massachusetts would desire to have the legal questions involved passed upon by her legal officers and if those officials should, by reason of their own independent review and judgment, determine the legal questions involved in this case in a manner consistent with this opinion to the end that the proper medical authorities of Massachusetts will be directed to accept custody of the petitioner for handling in accordance with the mental health laws of Massachusetts.

10. Dumbauld, "A Definition of Insanity", The Journal of the Tennessee State Medical Association, Vol. 55, No. 5, May, 1962, pages 171–177. See also Overholser, "Ten Years of Cooperative Effort", Journal of Criminal Law and Criminology, 29:28, 1938 for the painful history of the efforts of psychiatry and law to find a common language.