David Joseph RAWLS, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 14301-1.

United States District Court
W. D. Missouri, W. D.

May 27, 1963.

David Joseph Rawls, pro se.

F. Russell Millin, U. S. Dist. Atty., Kansas City, Mo., for respondent.

JOHN W. OLIVER, District Judge.

This habeas corpus proceeding presents, as a matter of first impression, the question of whether Chapter 313 of Title 18 United States Code (18 U.S.C.A. §§ 4241–4248, inclusive), relating to mental defectives, is applicable to persons sentenced pursuant to the Youth Corrections Act as it appears in Chapter 402 of Title 18 United States Code (18 U.S.C.A. §§ 5005–5026, inclusive).

While this is the fourth petition for habeas corpus filed by petitioner in this Court, this is the first case in which the question presented has been ripe for adjudication.[1]

Petitioner was sentenced by the United States District Court for the Western District of Louisiana on January 16, 1959, upon his plea of guilty to a violation of the Dyer Act (18 U.S.C.A. § 2312) under Section 4209 of Title 18 United States Code,[2] as a young adult

---

1. In Case No. 13262, Judge Albert A. Ridge, on April 18, 1961, considered in forma pauperis but denied petitioner's motion for a writ of habeas corpus predicated generally on remarks made by the sentencing judge at the time of the sentence. In Case No. 13566–2, Judge Floyd R. Gibson, on November 24, 1961, considered in forma pauperis but denied a petition for a writ of injunction which generally alleged mistreatment. In Case No. 14210–2, Judge Floyd R. Gibson, on January 15, 1963, considered in forma pauperis but denied a petition for a writ of habeas corpus which tended to raise the issue here presented on the ground it was premature.

2. Section 4209 of Title 18 United States Code, provides: "In the case of a defendant who has attained his twenty-second birthday but has not attained his twenty-sixth birthday at the time of conviction, if, after taking into consideration the previous record of the defendant as to delinquency or criminal experience, his social background, capabilities, mental and physical health, and such other factors as may be considered pertinent, the court finds that there is reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act (18 U.S.C. Chap. 402) sentence may be imposed pursuant to the provisions of such Act."

offender for an indefinite term under § 5010(b) of Title 18 United States Code. Service of that sentence commenced February 5, 1959.

§ 5010(b) of Title 18 United States Code, provides:

"If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter until discharged by the Division as provided in section 5017(c) of this chapter; * * *."

§ 5017(c) of Title 18 United States Code, provides:

"A youth offender committed under section 5010(b) of this chapter shall be released conditionally under supervision on or before the expiration of four years from the date of his conviction and shall be discharged unconditionally on or before six years from the date of his conviction."

Petitioner alleges that "he is now entitled to be released from custody * * * having served the entirity [sic] of the sentence imposed upon him, to-wit: four (4) years imposed by the United States District Court for the Western District of Louisiana". Petitioner suggests that since "Section 5017(c) definitely states that persons sentenced under the provisions of Section 5010(b) shall be released conditionally under supervision on or before the expiration of four (4) years" that "persons sentenced under § 5010(b) has [sic] served the sentence in its entirety, in so far as the custody is concerned, at the expiration of four years from the date of conviction, unless he has been released in accordance with Section 5017(c) and later returned to custody pursuant to Section 5020, 18 U.S. C." Petitioner accordingly contends that

"he was entitled to be released from custody on the 5th day of February, 1963, and that he is now being held in custody unlawfully and in violation of the Constitution".

On January 25, 1963, before the expiration of the initial four year period, the Acting Director of the Federal Bureau of Prisons, acting pursuant to Section 4247 of Title 18 United States Code, filed with the Clerk of this Court a certificate of mental incompetency asserting the probable dangerousness of petitioner in the event of his release. In accordance with Section 4247, a hearing of that matter was commenced on the 4th day of February, 1963. On February 8, 1963, we dismissed the Section 4247 proceeding for the reason that some time on February 4, 1963, but not as a part of the hearing being conducted pursuant to Section 4247, the Director of the Bureau of Prisons, acting for the Attorney General, executed a certification under the provisions of Section 4241, Title 18 United States Code. That certification had long ago been recommended by the Board of Examiners of the Federal Correctional Institute at Texarkana, Texas, on February 15, 1961. The report and recommendation of the Board of Examiners was accepted by the Director of the Bureau of Prisons for the Attorney General on February 4, 1963, but the acceptance was ante-dated: "Nunc pro tunc, 3–8–61". It is clear, however, that the acceptance of the report and recommendation under Section 4241 was not in fact made until February 4, 1963.

In our order of February 8, 1963 dismissing the Section 4247 proceeding we expressly found that the certification under Section 4241 made the issues presented in that proceeding moot. The Government's petition under Section 4247 accordingly was dismissed without prejudice. Petitioner's present petition for habeas corpus seeks to test the validity of his confinement pursuant to Section 4241.

The precise question raised by that petition is whether the petitioner may, under the authority of Section 4241,

be kept " * * * [in] the United States hospital for defective delinquents [the Springfield Medical Center for Federal Prisoners] * * * until, in the judgment of the superintendent of said hospital, the prisoner shall be restored to sanity or health or until the maximum sentence, without * * * commutation of sentence, shall have been served".[3] The answer to that question turns on whether Chapter 313 is applicable to persons sentenced under the Youth Corrections Act and whether Congress intended that those two acts should be read together.

Section 5017(c) provides that youth offenders committed under Section 5010 (b), as was petitioner in this case, "shall be *released conditionally* under supervision on or before the expiration of four years from the date of his conviction and shall be *discharged unconditionally* on or before six years from the date of his conviction". What did the Congress mean by the language "shall be *released conditionally* at the end of four years" and *"discharged unconditionally"* at the end of six?

Did Congress intend that a prisoner should serve a possible maximum of six years in the event a valid certificate is made under Section 4241? In that event, may the Attorney General legally order, pursuant to Section 4241, that the prisoner "be kept until, in the judgment of the superintendent of [the] hospital, the prisoner shall be restored to sanity or health or until the maximum sentence, without deductions for * * * commutation of sentence, shall have been served"? Did Congress intend the provision relating to conditional release at the end of four years in Section 5017 (c) to be considered as "commutation of sentence" within the meaning of Section 4241? Did Congress intend that

the two years between conditional release and unconditional discharge might be taken away from a particular prisoner by a proper certification and directive made pursuant to Section 4241?

At least part of the answer to those questions will be found in ascertaining what meaning must be given to the Congressional language "without deduction for * * * commutation of sentence" as it appears in Section 4241. Words such as "commutation of sentence", "conditional release", and "unconditional discharge" are not words of purchase as used in the criminal statutes of the United States. We have noted elsewhere that the language used by those who administer the criminal law and the language used by the statutes and by the courts is not always the same. See Clark v. Settle, W.D.Mo.1962, 206 F.Supp. 74, 77.

Careful study of the statutes and of the cases demonstrates that administrative language sometimes is first accepted by court decisions and that the language of the cases then finds its way into the statutory law. The statutes relating to good time allowance as found in Chapter 309 of Title 18 United States Code, illustrate the point. Section 4163 of that chapter, for example, provides that "a prisoner shall be released at the expiration of his term of sentence less the time deducted for good conduct". And Section 4164 provides that such a prisoner "shall, upon release, be deemed as if released on parole until the expiration of the maximum term or terms for which he was sentenced less one hundred and eighty days."

Nothing is said in either of those statutes (or in any other statute relating to the subject) about a prisoner being given a "conditional release". But even a slight acquaintance with the cases teach-

**3.** In the case of a sentenced adult offender, it is clear that a certification under Section 4241 deprives a prisoner of good time. See Douglas v. King, 8 Cir. 1940, 110 F.2d 911, 127 A.L.R. 1200, Estabrook v. King, 8 Cir.1941, 119 F.2d

607, Kuczynski v. Cox, 8 Cir.1944, 141 F.2d 321, cert. denied 323 U.S. 741, 65 S.Ct. 40, 89 L.Ed. 594, Garcia v. Steele, 8 Cir.1951, 193 F.2d 276, and Urban v. Settle, 8th Cir.1962, 298 F.2d 592.

es that courts began to accept and use the quite descriptive administrative language that a prisoner released under those statutes was "released conditionally", or "on conditional release", as distinguished from being "discharged unconditionally" or "released outright". See Wipf v. King, 8 Cir.1942, 131 F.2d 33, and Urban v. Settle, 8 Cir.1962, 298 F.2d 592, for only two of the numerous examples in which such releases are so described.

We therefore not unexpectedly find the words "released conditionally" and "discharged unconditionally" are used by the Congress in Section 5017(c) to describe a form of legislative commutation contained in that statute. The word "commutation" has been subject to the same looseness of language that we have noted. Bouvier defines "commutation" as "the change of a punishment to which a person has been condemned into a less severe one". Generally speaking, that definition is legally quite accurate. But when Bouvier adds, upon the authority of three old state cases, that "this can be granted only by the authority in which the pardoning power resides", he encourages a confusion of concepts. The latter statement reflects the absence of preciseness in the technical use and understanding of the words "commute" or "commutation". We read in the newspaper, for further example, that "the President (or the Governor) *commutes* a death sentence to life imprisonment". Only in the sense that a lesser penalty resulted from the President's or Governor's ac-

tion can it be said the chief executive "commuted" the sentence.

Legally speaking, of course, the chief executive did not "commute" anything; he exercised his power of pardon.

█ Article 2, Section 2, of the Constitution of the United States provides that "[t]he President * * * shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment". But that does not mean that power to provide for lesser sentences is an exclusive executive power. Congress has full power to pass legislation under which lesser sentences may be served. The statutes relating to good time and to probation and parole are familiar examples of legislative commutation.[4]

██ When the Congress passes a statute providing for a lesser penalty in all cases, as distinguished from legislation that might relate to a special or particular case, it acts within the proper scope of its legislative power. We hold that when Congress passed Section 5017 (c), providing as it did that a youth offender be discharged unconditionally on or before six years but that such person could be released conditionally on or before four years, it intended to pass a statute relating to the "commutation of a sentence", as those words are used in the last sentence of Section 4241.[5] It is therefore apparent that Section 4241 may be applied to persons sentenced under Section 5017(c) without doing violence to the purposes of either section.

4. See Nix v. James, 9 Cir.1925, 7 F.2d 590, 593, and cases there cited, holding that such legislation does not encroach on the pardoning power of the President. See also State ex rel. Oliver v. Hunt, (Mo.Sup.Ct.1952) 247 S.W.2d 969, for a like holding in regard to a State constitution. And Cf. Solesbee v. Balkcom, 339 U.S. 9, 11, 70 S.Ct. 457, 94 L.Ed. 604 (1950) and Ex parte Grossman, 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527 (1925).

5. Any suggestion that a youth offender must under any and all circumstances be

conditionally released at the end of four years overlooks the provision contained in Section 5007 of Title 18 United States Code, which authorizes the Youth Correction Division "to enter orders directing the release of * * * youth offenders conditionally". Such a provision must mean that an order must, in fact, be entered before a youth offender is conditionally released. We do not pass on any situation other than that presented by the facts here involved as to when, if ever, the Division may refuse to sign an order for a conditional release.

██ But did Congress intend that Chapter 313 relating to mental defectives be read with the Youth Corrections Act as it appears in Chapter 402? United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939) collects the cases that state the familiar and applicable principle of statutory construction. It is there stated as a "cardinal principle of construction" that "repeals by implication are not favored". That case also held that "when there are two acts upon the same subject, the rule is to give effect to both if possible". The Supreme Court there accepted and repeated Mr. Justice Story's early observation in Wood v. United States, 16 Pet. 342, 362, 363, 10 L.Ed. 987 (1842), to the effect that the fact that "subsequent laws cover some or even all the cases" covered by the prior act is not a sufficient ground upon which to base a judicial determination that the prior and subsequent acts are in conflict, one with the other. In such a case the Congress may have intended that the subsequent act be "merely affirmative, or cumulative, or auxiliary" to the prior act. See also Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389, in which it was held that "the guiding principle to reconciliation of the two statutory schemes" is to imply a repeal "only if necessary to make [the subsequent statute] work, and even then only to the minimum extent necessary".

An analysis of the Congressional history of the chapter on mental defectives and the chapter containing the Youth Corrections Act commands the judicial finding that the Congress clearly intended that the two acts be read together and that the latter be considered as "affirmative, cumulative, or auxiliary" to the former. The Congressional history of the Youth Corrections Act establishes that it would be unthinkable to presume that the Congress intended to deny persons sentenced under the subsequently enacted Youth Corrections Act the benefits of the provisions of Chapter 313 which it had enacted in 1930.

1930 marked the year of the establishment of the Bureau of Prisons and the year that fundamental changes of policy in regard to crime and punishment were formulated by the Congress. The history of the 1930 legislation is stated in the 1960 report of the Work of the Federal Bureau of Prisons. It is there stated that a "Congressional Committee [was] appointed in 1929 to study conditions in Federal prisons and to recommend remedial legislation" and that "it was out of this Congressional investigation that the Bureau of Prisons was established and the basic policies formulated for the development of a Federal Prison system so designed as to provide programs of treatment, training, and custody adapted to the physical, mental, and vocational rehabilitation of the offender".

Generally speaking, 1930 marked the year that Congress turned basically from reliance upon ancient concepts of retribution to modern programs that emphasized individualized correction and rehabilitation.

Present Section 4081 of Title 18 United States Code, which was Section 7 of Chapter 339 of the Act of May 27, 1930, 46 Stat. 390, reflects the basic change of Congressional policy made in 1930. It provides:

"The Federal penal and correctional institutions shall be so planned and limited in size as to facilitate the development of an integrated system which will assure the proper classification and segregation of Federal prisoners according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions."

Section 4241 was a part of the remedial legislation passed as a part of the Act of May 27, 1930, which also contained Section 4081. And the authorization for

what became the Springfield Medical Center was a part of that same legislation. Basic revisions in probation and parole were likewise a part of the same broad Congressional program.

The discussion in Congress reflects the spirit of that legislation. Senator Copeland, on May 7, 1930, after referring to President Hoover's message to the Congress of April 28, 1930 in which the President called for "modern treatment of prisoners", stated on the floor of the Senate that "present conditions constitute a crime against decency and against our civilization" (72 Cong.Record, 71st Cong., 2nd Sess. p. 8519). And Congressman La Guardia's remarks on the floor of the House reflected Congressional hopes for what is now the Springfield Medical Center. He stated: "We provide here today for * * * a hospital for sick prisoners. We are trying to bring about a scientific and proper treatment of prisoners. Many of them are young men who came within the clutches of the law by force of circumstances, and they may be saved". (72 Cong.Record, 71st Cong. 2nd Sess. p. 2162).

The Congressional history of the Youth Corrections Act establishes beyond doubt that its purpose was, to use the ancient language of Mr. Justice Story, "affirmative, cumulative, and auxiliary" to the declared purposes of the 1930 remedial legislation that altered the entire focus of the administration of criminal justice in the Federal system.

In September, 1941, the Judicial Conference of Senior Circuit Judges (presently the Judicial Conference of the United States) reported that opposition had been expressed in some circuits to the 1940 Conference recommendation for the passage of an indeterminate sentence law for the Federal courts. A Conference committee composed of Circuit Judge Parker as Chairman, Circuit Judges Hand and Phillips, and District Judges Hincks, Collet, McCormick, and Laws was appointed to make "a further study * * * of the indeterminate sentence,

the objections of the district judges thereto, and the general subject of punishment for crime, including the treatment of youthful offenders" (Report of Judicial Conference of Senior Circuit Judges, September Session, 1941).

That Committee reported back to the Judicial Conference in June, 1942. Extensive legislation was proposed concerning the indeterminate sentence and other matters, together with a specific recommendation for what is now the Youth Corrections Act. In regard to that legislation, the Committee stated:

"The purpose of this portion of the act is to provide for youthful offenders committed to the Authority the type of correctional treatment which has been found so successful in England in the treatment of youthful offenders, and which is recommended by the American Law Institute."

And, more importantly, the subcommittee report stated the basic rationale of the proposed legislation:

"The underlying theory of the act is to substitute for retributive punishment, methods of training and treatment designed to correct and prevent criminal tendencies. The plan of the act departs from the merely punitive idea of dealing with youthful offenders and looks primarily to the objective idea of rehabilitation."

The report of the Committee demonstrates that it not only relied upon the work of the American Law Institute but that it was greatly influenced by British experience with the Borstal System which had been in operation there since 1894. Appendix II to the Subcommittee report was an article entitled "The Borstal System" by Leland L. Tolman, and attention on page 39 was called to the following authorities:

Criminal Youth and the Borstal System, Healy and Alper; The English Borstal System of Parole and After-Care, Alper, Federal Proba-

tion, October-December, 1941, p. 29; The Lowdham Grange Borstal Institution, Cape, Id. p. 34.

The legislation proposed by the Committee was approved by the Judicial Conference and the Youth Corrections Act was introduced as House Bill 2140 in the Seventy-Eighth Congress. At the hearings before a subcommittee of the House Judiciary Committee on June 10, 1943, James V. Bennett, then and now Director of the Bureau of Prisons, submitted his Reference Notes on the Federal Corrections Act. In regard to the background for the proposed legislation, the following significant statement is made on page 121 of those hearings:

"For more than 200 years the primary end of criminal justice has been punishment—punishment so thorough and exacting that the offender would be deterred from any desire to return to his former behavior, or, in the more extreme cases, would never again be able to do so. * * * The emphasis has been measurably changed in the past two decades. Into the modern institution have been introduced the specialized skills and techniques of the physician, the psychiatrist, the psychologist, the educator, and the case worker. * * * All institutional facilities are utilized in a well-developed program of classification; and the objective of the treatment program is to return the offender to the community better prepared to accept his responsibilities as a citizen."

The year of 1930 was identified as the year in which the Congress departed from sole reliance on the ancient concepts of deterrence and retribution. The paragraph following that just quoted states:

"Congress recognized the importance of this principle in 1930 in the following words:

"'It is hereby declared to be the policy of the Congress that the said institutions be so planned and limited in size as to facilitate the development of an integrated Federal penal and correctional system which will assure the proper classification and segregation of Federal prisoners according to their character, the nature of the crime they have committed, their mental condition, and such other factors as should be taken into consideration in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions' (ch. 339, sec. 7, 46 Stat. 390).

"Since 1930, provision has been made for the improvement and expansion of the Federal Penal and Correctional Service, until, at the present time, it embraces one of the largest institutional systems in existence."

The Youth Corrections Act did not pass the Seventy-Eighth Congress. It was reintroduced in the Eighty-first Congress in 1949 and was passed in 1950. The Hearings held on October 5, 6, and 7, 1949, before the subcommittee of the Senate Judiciary Committee on Senate Bills 1114 and 2609, are in the same pattern as the 1943 hearings and amplify the testimony given in support of the earlier proposal.[6] Nothing in the Youth Corrections Act in any way indicates that it was in the mind of anyone to deprive

---

6. Detailed analysis of that legislative history or of the declared rehabilitative purpose of the Youth Corrections Act as passed is redundant. Other courts have recognized that purpose. See, for example, Judge Burger's opinion in Carter v. United States, 1962, 113 U.S.App.D.C. 123, 306 F.2d 283, 285, in which he states "the basic theory of [the Youth Corrections] Act is rehabilitative". See also

United States v. Lane, 9 Cir.1960, 284 F.2d 935, 941, in which it was held that "the purpose of Congress in passing [the Youth Corrections] Act was to make available * * * a system for the sentencing and treatment of youth offenders by permitting the substitution of correctional rehabilitation rather than retributive punishment".

one sentenced under that Act of the benefits of Chapter 313. In fact, the letter of Peyton Ford, the Assistant to the Attorney General, (the letter was attached to Senate Report No. 1180 recommending the passage of the Youth Corrections Act to the 81st Congress, 1st Session) reflects the conviction that the more flexible method of sentence "would greatly facilitate the handling of * * * youth offenders", and that "this would permit such offenders to receive the full benefit from various rehabilitative treatment *now* or hereafter made *available*". We emphasize the words "now * * * available" because the mental health facilities of the Springfield Medical Center were, in 1949, *then* available.

In view of the Congressional history and declared purpose of the Youth Corrections Act and the consistency of that purpose with the remedial legislation enacted by the Congress since 1930, we hold that the provisions of Chapter 313 are generally applicable to persons sentenced under the Youth Corrections Act. Specifically, we hold that power was vested in the Attorney General by Section 4241 to direct, upon his acceptance of the report of the Board of Examiners, the transfer of the petitioner to Springfield Medical Center to be there kept until, in the judgment of the superintendent, the prisoner has been restored to sanity or health or until the maximum sentence has been served, without deduction for any commutation of his sentence.

As we have indicated, petitioner's maximum sentence under the Youth Corrections Act, without commutation, is six years. The fact that petitioner might remain in the custody of the Attorney General for longer than the five years maximum provided in Section 2312 of Title 18, does not void petitioner's present commitment under the Youth Corrections Act. See Cunningham v. United States, 5 Cir.1958, 256 F.2d 467. Cf. however, Pilkington v. United States, 4 Cir.1963, 315 F.2d 204. We, of course, do not reach that precise point in this case because, on the facts, petitioner obviously has not yet served a maximum of five years as provided in Section 2312 of Title 18 United States Code.

What we have said thus far relates to power. We have held that power to act under Section 4241 was present. And we again note that we have recognized that we have no judicial power to order another sanity hearing for petitioner. See cases cited in footnote 3 above, and Craft v. Settle, W.D.Mo.1962, 205 F.Supp. 775, and cases cited on page 777 and 780 of 205 F.Supp. See also Swisher v. United States, W.D.Mo.1962, 211 F.Supp. 917, for a case involving a military prisoner.

But to say that power to act is present is not to say that we discharge our full duty of disposing of this case "as law and justice require", as we are directed by Section 2243 of Title 28 United States Code. We must inquire whether that power was in fact exercised and determine whether the Government's action squares with the requirements of the statute. Certainly statutes designed for the treatment and rehabilitation of individual prisoners should not be administered in a manner inconsistent with that purpose.

The Section 4241 certificate shows on its face that it was signed by only two members of the Board of Examiners and that it was signed by them on February 15, 1961, at the Federal Correctional Institution at Texarkana, Texas. It also shows that the acceptance of the report was made on behalf of the Attorney General "nunc pro tunc 3–18–61". It is undisputed that the actual date of acceptance, however, was during the aborted Section 4247 hearing.

The transcript of the proceedings at that hearing reveals the practical problems then faced by everyone concerned with the welfare of the petitioner. On the first day of the Section 4247 hearing, we made clear our conviction that the Government was required by that Section to prove three separate elements before any order under that section could be sustained. Those three elements are: (1) that "the prisoner is insane or men-

tally incompetent"; (2) that "if released he would probably endanger the safety of the officers, property, or other interests of the United States"; and (3) that "suitable arrangements for the custody and care of the prisoner are not otherwise available", all within the meaning of Section 4247. We also stated our view that if there was a failure of proof in regard to any single element, the Government's case would necessarily fail.

It became apparent at the Section 4247 hearing that before the element of dangerousness was somehow introduced into that case, the Staff at the Springfield Medical Center had recommended that arrangements be made for state hospitalization of the petitioner. Procedures under the power conferred by the last sentence of Section 4248 in fact had been commenced.

The Section 4247 transcript reveals, however, that "when this element of dangerousness was introduced, the usual and routine followup of getting some response from the State authorities was not carried through, because this [case] did uniquely have the element of dangerousness". At that time we summarized the factual situation established by the testimony of petitioner's doctor and the Government's doctor on page 45 of the transcript by stating:

"I am satisfied from the testimony of both these doctors and from the report attached to the certificate filed by the Director of Prisons that there is very little doubt about the establishment of the first element of mental incompetency. I think it would be extremely unkind to this defendant to shift him completely from the environment that he has been in, which has been practically a single cell confinement, evidently by reason of his own choice. The Court cannot ignore the recommendation of both the psychiatrists that a period of further hospitalization would be the best thing that could happen to this young man."

But the Government could not then ignore the fact that something had to be done; else the petitioner might be released on the street contrary to the advice of every doctor, including his own. There is a suggestion in the testimony of Dr. Oppegard, Chief Psychiatrist at Springfield Medical Center, that the pressure of time may have played some real part in the selection of the procedural alternatives then available. After agreeing with Dr. Clary's (petitioner's doctor) opinion that "the best thing for [petitioner's] own sake would be a period of hospitalization in Texas before being released to the community at large", Dr. Oppegard commented, perhaps in possible explanation of the Government's action, that "because his release date was tomorrow, and we had not received any information as yet from Texas, we knew to a great deal of certainty that nothing would come through, and therefore he would be released to his sister, on his own, tomorrow." [7]

The long and the short of the matter was, as stated by Associate Warden Mayden, "up until the question of dangerousness was introduced, and had dangerousness not been introduced, this [case] would have been handled in ordinary routine for transfer of custody to a state institution". The Section 4247 hearing was adjourned on February 4, 1963, to permit all persons concerned to clarify the question of the availability of Texas facilities and the conditions under which petitioner might be there ac-

---

**7.** Both doctors agreed at the Section 4247 hearing that outright release would probably be the worst thing that could happen to petitioner. Dr. Clary testified that petitioner "could not conform with the demands of society, that he is far from being rehabilitated", that while he "would not be dangerous, or violent * * I would imagine what he would do would be to arrange to do something to get sent back to prison, because prison obviously means security to him". Dr. Oppegard found many areas of agreement with Dr. Clary, including the thought that it was not unlikely that petitioner "probably would commit a minor crime to get back in prison".

cepted. The sister of the petitioner indicated at the Section 4247 hearing that if the doctors believed her brother should be committed for a period of time in Texas before his release into the community, such an arrangement would be satisfactory with her.

Petitioner, in one of his numerous letters to this Court, has stated that "I have gained enough insight to know that a transitional period in an institution other than the Medical Center would undoubtedly be very beneficial to me". Such a statement, of course, must be taken with more than a grain of salt in view of the medical testimony we have already heard.

But what is clear is that the exploration of the possibilities concerning further hospitalization in Texas, as initially recommended by the doctors has not gone forward since the Section 4247 hearing was commenced.

We are convinced that not unreasonable doubts concerning the applicable law may have also played a part in the Government's somewhat belated election of available administrative procedures under both Section 4247 and, later, under Section 4241. The record, for example, does not indicate whether any consideration was given Sections 5011 and 5013 of the Youth Corrections Act. Section 5011 provides that "[c]ommitted youth offenders not conditionally released shall undergo treatment in institutions * * * including * * * hospitals * * * and other agencies that will provide the essential varieties of treatment". Section 5013 vests power in the Director of the Bureau of Prisons to "contract with any appropriate public or private agency not under his control for the custody, care, subsistence, education, treatment, or training of committed youth offenders the cost of which may be paid from the appropriation for 'support of United States Prisoners'". Given time, such sections of the Youth Corrections Act, or even other sections of Chapter 313, might have been or might now be utilized to accomplish a better available solution for petitioner's future treatment.

We have not overlooked petitioner's complaint that he "has never been examined by Blocker H. Joslin, M. D. (one of the doctors who signed the Section 4241 certificate as a member of the Board of Examiners) and especially has not been examined by any such board for the purpose of psychiatric examination". We could, of course, pursuant to Section 2246 of Title 28 United States Code, presently order that the facts concerning that matter be obtained by affidavit or by other means. We could also set this matter down for an immediate hearing to obtain an even fuller picture of the background as to why the Government first elected to proceed under Section 4247 and why it later elected to act pursuant to Section 4241. But the taking of those steps at this time would but tend to postpone any immediate consideration of administrative alternatives that might, if a breathing spell in litigation were permitted, make any further hearing unnecessary. From the petitioner's standpoint, it must also be recognized that the limitations upon our judicial power to review the administrative determinations made pursuant to the power conferred by Section 4241, if regularly made in good faith, might mean that an immediate hearing would necessarily postpone any presently contemplated administrative review of petitioner's present situation; if, of course, such a review is in fact contemplated. We again face a practical problem of judicial administration and we shall attempt to meet it.

We believe that our inherent power and the power specifically conferred by Section 2243, Title 28 United States Code, to dispose of habeas corpus proceedings as law and justice require, is broad enough to permit a reasonable period of time to elapse before we order further proceedings in this cause. We believe further that, because of the most unique factual situation presented by this case, we may presume that the Government, if given a reasonable period of time, will make immediate further inquiry into the administrative alternatives

that may be utilized in connection with the individualized treatment of petitioner. The obvious concern for the welfare of individual petitioner, evidenced by everyone involved in the Section 4247 hearing, confirms our general judicial experience that the people who administer the correctional institutions of the United States in general, and those who administer the Springfield Medical Center in particular, attempt to execute the now long established Congressional policy that looks toward the rehabilitation of the individual offender.

We recognize, of course, that the pressure of time has played its part in this case and that time is always required to carry out the best of intentions. Time, in fact, has been a commodity peculiarly lacking in this particular case. We are convinced that it lies within our power to see that it now be added.

Accordingly, the following order should be and is hereby made:

1. Petitioner is granted leave to file his petition for writ of habeas corpus in forma pauperis.

2. This Court hereby accepts jurisdiction of this cause but determines that no order, other than this Memorandum and Order, will be entered for a period of twenty (20) days.

3. The Government is granted leave to take any and all administrative action authorized by law that it may elect to take during the said twenty (20) day period. The Government shall immediately advise this Court of any such administrative action that it may take within the said twenty (20) day period.

4. Should the Government elect not to take any administrative action during said twenty (20) day period, it shall immediately so advise the Court so that further proceedings in this cause may be ordered without delay.

5. The Government shall, in any event, file a report concerning the matters covered by paragraphs 3 and 4 of this Order not later than twenty (20) days from the date of this Memorandum and Order.

It is so ordered.